**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Elizabeth E. Brown

| | |
|---|---|
| In re: | Bankruptcy Case No. 10-33952 EEB |
| BALL FOUR, INC., | Chapter 11 |
| Debtor. | |
| BALL FOUR, INC., | |
| Plaintiff, | Adversary Proceeding No. 12-1036 EEB |
| v. | |
| 2011-SIP-1 CRE/CADC VENTURE, LLC, | |
| Defendant. | |

**ORDER GRANTING SUMMARY JUDGMENT AS TO SOME CLAIMS AND PROPOSING FINDINGS OF FACT AND CONCLUSIONS OF LAW TO GRANT SUMMARY JUDGMENT AS TO REMAINING CLAIMS**

THIS MATTER comes before the Court on the Motion for Summary Judgment ("Motion"), filed by the Defendant 2011-SIP 1 CRE/CADC Venture, LLC ("SIP") and the Response of Plaintiff Ball Four Inc. ("Ball Four"). For the reasons set forth below, the Court FINDS and CONCLUDES that summary judgment should be granted as to the claims disallowance and equitable subordination claims, and further holds that the remaining claims are non-core "related to" claims as to which the Court may only enter proposed findings and conclusions. The Court, therefore, recommends to the District Court that it grant summary judgment as to these remaining claims as well.

**I.     BACKGROUND**

Plaintiff is the reorganized Debtor, whose plan was confirmed on August 29, 2011. SIP is the successor in interest to FirsTier Bank and stands in the bank's shoes as the purchaser of the Debtor's loan from the FDIC in its capacity as receiver for FirsTier Bank (the "Bank"). The Bank filed a proof of claim in the main bankruptcy case based on a loan in the original amount of $1,950,000, which was made to enable Ball Four to finance the construction of a sports complex ("Construction Loan"). In this adversary proceeding, Ball Four alleges that the Bank mishandled the Construction Loan, beginning when the Bank made payments to certain contractors in "direct contravention" of Ball Four's explicit instructions, causing Ball Four to lose all ability to negotiate with its contractors, with resulting damage to its business. Ball Four

also alleges that the Bank failed to honor its written commitment to provide permanent financing, and that it was unable to obtain alternative financing due to the project being over-budget because of the payments made by the Bank over Ball Four's objections. Ball Four asserts five claims for relief against SIP based on this conduct: 1) damages for breach of contract on the Construction Loan; 2) damages for breach of contract for failure to honor a Permanent Loan Commitment; 3) actual damages, costs of suit and interest for breach of the implied covenant of good faith and fair dealing; 4) equitable subordination of SIP's entire claim pursuant to 11 U.S.C. § 510; and 5) disallowance of SIP's entire claim pursuant to 11 U.S.C. § 502(b)(1).

The Motion alleges that SIP is entitled to summary judgment on the Debtor's first three claims for relief for breach of contract and breach of the covenant of good faith and fair dealing as a matter of law because they are based on actions specifically permitted by the applicable loan documents. SIP further alleges that any oral promises that may have been made about permanent financing aside from those loan documents are legally barred by the statute of fraud and the D'oench Duhme doctrine, as codified by the Financial Institutions Reform Recovery and Enforcement Act ("FIRREA"). Because the fourth and fifth causes of action for equitable subordination and disallowance of SIP's proof of claim depend on the same allegedly inequitable and improper conduct that the first three claims describe, SIP argues that they also must fail. SIP also argues that the Debtor's equitable subordination claim (claim 4) fails to allege any inequitable conduct that would justify subordination of its claim under applicable case law. Finally, SIP alleges that the economic loss rule bars any claims based on any "special relationship" between the Bank and Ball Four.

In support of its Motion, SIP points to several provisions of the Construction Loan Agreement between Ball Four and the Bank, dated September 22, 2005 ("Agreement"). Ex. A.[1] SIP argues that the relevant provisions of the Agreement prohibit exactly the types of claims brought by Ball Four in this Adversary Proceeding. With respect to disbursement of loan funds, the Agreement required the Debtor to apply to the Bank for each advance on a standard form and imposed certain conditions on the Bank's obligation to fund. In addition, the Agreement contains a provision allowing the Bank to disburse funds directly to a contractor, at its sole option. That provision reads:

> **Payments**. At the sole option of Lender, Advances may be paid in the joint names of Borrower and the General Contractor, subcontractor(s), or supplier(s) in payment of sums due under the Construction Contract. At its sole option, Lender may directly pay the General Contractor and any subcontractors or other parties the sums due under the Construction Contract. Borrower appoints Lender as its attorney-in-fact to make such payments. This power shall be deemed coupled with an interest, shall be irrevocable, and shall survive an Event of Default under this Agreement.

Ex. A, at 3.

---

[1] Exhibits referenced by letters are attached to the Motion. Exhibits referenced by number are attached to the Response.

The following page of the Agreement contains a limitation on the lender's responsibility for advances made. The paragraph, titled "Limitation of Responsibility," states:

> The making of any Advance by Lender shall not constitute or be interpreted as either (A) an approval or acceptance by Lender of the work done through the date of the Advance, or (B) a representation or indemnity by Lender to any party against any deficiency or defect in the work or against any breach of any contract. Inspections and approvals of the Plans and Specifications, the Improvements, the workmanship and materials used in the Improvements, and the exercise of any other right of Inspection, approval, or inquiry granted to Lender in this Agreement are acknowledged to be solely for the protection of Lender's interests, and under no circumstances shall they be construed to impose any responsibility or liability of any nature whatsoever on Lender to any party. Neither Borrower nor any contractor, subcontractor, materialman, laborer, or any other person shall rely, or have any right to rely, upon Lender's determination of the appropriateness of any Advance. No disbursement or approval by Lender shall constitute a representation by Lender as to the nature of the Project, its construction, or its intended use for Borrower or for any other person, nor shall it constitute an indemnity by Lender to Borrower or any other person against any deficiency or defects in the Project or against any breach of contract.

Ex. A, at 4.

The Agreement also absolves the lender from making any advances or loans in the event of a default. The paragraph titled "Cessation of Advances" states, in relevant part:

> If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; . . .

Ex. A, at 4. The events of default listed in the Agreement include failure to make any payment when due under the loan. It is also an event of default if "[t]he Improvements are not constructed in accordance with the Plans and Specifications or in accordance with the terms of the Construction Contract." Ex. A, at 6.

SIP argues that, since all of the disbursements made by the Bank were consistent with the Bank's rights under the Agreement, there was no breach of contract or of the covenant of good faith and fair dealing. As for breach of a commitment to provide permanent financing, SIP argues that, while the commitment letter says it was for "permanent financing," in fact it actually contemplated only the limited term Construction Loan. The Agreement and related documents mirror the terms proposed in the commitment letter. Alternatively, SIP argues that, even if the commitment was indeed one for permanent financing, the Bank's obligation to provide permanent financing was negated by the Debtor's default, which it alleges is admitted by the Complaint. A review of the Complaint does, in fact, show statements admitting defaults. For

3

example, paragraph thirty-nine states that in February, 2010 approximately $64,000 was needed to bring the loan current, an admission that the loan payments were in default. The Complaint's allegations regarding why the Debtor directed the Bank not to pay The Wright Group (¶¶ 21-24), Rhino Sports (¶¶ 28-30), and Diamond Excavating (¶¶ 33-35) evidence that the construction was not done in accordance with the plans and specifications, as required by the Agreement. In addition, the Construction Loan matured and was due and payable in full on March 19, 2009. Ex. D.

Ball Four's Response does not dispute the authenticity of the loan documents attached to the Motion. Instead, it asserts that the provisions of the Agreement create an ambiguity regarding the parties' intent that will preclude summary judgment. It further asserts that it is not seeking to modify or contradict the terms of the loan documents. Instead it asserts that the Bank's conduct in making the disputed payments over Ball Four's specific objections breached the implied covenant of good faith and fair dealing applicable to every contract under Colorado law because the Bank exercised its discretion under the Agreement outside of accepted commercial practices and in a manner inconsistent with the reasonable expectations of the parties. As for its claim for breach of the commitment to provide permanent financing, Ball Four argues that SIP mischaracterizes that document, attaching excerpts from the deposition of a former Bank officer, which it contends confirm that the intention was to provide permanent financing, not simply the Construction Loan. As for its fourth and fifth claims for relief, Ball Four asserts that it has pled cognizable claims under federal law for equitable subordination and disallowance of SIP's secured and unsecured claims, based on the alleged breach of the implied covenant of good faith and fair dealing, that should be allowed to proceed to trial. Finally, Ball Four clarifies that all of its claims arise solely from the written loan documents. It is not asserting any oral or unwritten side agreements to which the Colorado Credit Agreement Statute of Frauds and the D'oench Duhme doctrine, as incorporated in FIRREA, would apply, any tort claims to which the economic loss rule would apply, or any special trust relationship between the Bank and itself based on the attorney-in-fact language in the Payments provision.

Accordingly, the question before this Court is whether SIP is entitled to summary judgment on Ball Four's claims for relief based on the language of the loan documents as a matter of law.

## II. JURISDICTION AND STANDARDS OF REVIEW

### A. Jurisdiction

Early in this case, the Court *sua sponte* raised concerns regarding its jurisdiction to hear Plaintiff's claims based on the Supreme Court's ruling in *Stern v. Marshall,* 131 S.Ct. 2594 (2011). Given that Ball Four asserts claims for breach of contract and of the implied duty of good faith and fair dealing, the traditional "stuff" of plenary suits to be brought before a state court or an Article III court, the Court requested briefs from both parties on the jurisdictional issues. SIP declined to submit a brief, but had already admitted jurisdiction in its Answer. Ball Four urged the Court to exercise jurisdiction on the basis that its claims were integrally tied to the claims allowance process. On August 29, 2012, the Court entered its Order Determining Jurisdiction, retaining jurisdiction to hear these claims. Subsequent to Ball Four's briefing, no

less than three circuit court decisions have been rendered applying *Stern*'s holding, which have caused this Court to refine its views on the extent of its jurisdiction.

To begin its analysis, the Court looks to the statute that prescribes the bankruptcy court's jurisdiction, 28 U.S.C. § 157(b) ("§ 157 or "Section 157"). Subsection (b)(1) provides that the bankruptcy court may hear and determine, subject only to appellate review, "all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11 . . . ." Cases filed "under title 11," and core matters that "arise in or under title 11" fall within the court's jurisdiction, according to this statute. In essence, these are the matters that do not exist outside of the bankruptcy case and the Bankruptcy Code. The statute provides a non-exclusive list of sixteen examples of "core" matters within the bankruptcy court's jurisdiction. It further provides that as to matters that are related to a bankruptcy case, but "non-core," the bankruptcy court may hear the matter, but may only recommend proposed findings and conclusions (PFCs) to the district court for its *de novo* review. Thus, the statute separates matters into two categories: "core" and "non-core."

In *Stern*, the Supreme Court recognized a third category: matters delineated by the statute as "core," but which the Court found exceeded the constitutional boundaries of what a bankruptcy court could hear and finally determine. This third category is now commonly referred to as the "core, but unconstitutional" matters. Section 157(b)(2) expressly grants the bankruptcy court the statutory authority to hear a debtor's counterclaims, but in *Stern*, the court found it was not constitutional for the bankruptcy court to hear the debtor's state law counterclaim against a creditor because the counterclaim was the type of claim that must be heard by an Article III court, if it is to be heard by any federal court. The U.S. Constitution requires that the federal judicial power be exercised by Article III courts, whose judges enjoy life-time tenure and protection against diminution of their salaries. This is required in order to maintain the federal judiciary as a strong, independent third branch of government. Since bankruptcy judges are only appointed for a 14-year term and do not have the same salary protections, they cannot exercise the judicial power of the United States. Congress does not have authority to chip away at the Article III court's jurisdiction by carving out broader jurisdiction for its legislative courts.

So what are the types of claims that must be heard by an Article III court? The answer is all claims that are to be heard by a federal court must be brought before an Article III court, with three exceptions. The Supreme Court has conceded jurisdiction to: (1) territorial courts; (2) military tribunals; and (3) cases involving "public" versus "private" rights. *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 64-67 (1982). Bankruptcy courts do not qualify for the first two, but bankruptcy cases arguably may fit within the third category. In construing a "public" right, the Supreme Court has limited it to the bankruptcy court's

> restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, . . . [as] distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case. The former may well be a "public right," but the latter obviously is not.

*Id.* at 71.

This definition of a public rights reflects the historical limitation on bankruptcy jurisdiction that harkens back to eighteenth century England, from which American bankruptcy jurisprudence originated. Historically, a bankruptcy case was viewed as an *in rem* proceeding, with jurisdiction extending to the *res* of the estate's assets and the adjudication of claims against the *res*. To the extent that the bankruptcy estate's representative sought to assert claims that reached beyond the *res* to bring assets from the outside into the estate, whether through a fraudulent conveyance claim, a preference action, a breach of contract or tort claim, or any other basis, such claims exceeded the summary or *in rem* jurisdiction granted to the bankruptcy tribunal and invoked "plenary" jurisdiction. Historically in England, the bankruptcy commissioner was required to file a formal complaint in a court of law or by a formal bill in equity for matters that fell outside the summary jurisdiction of the bankruptcy tribunal. Interpreting the Bankruptcy Act of 1898, the Supreme Court adopted this same distinction between summary proceedings (which were within the province of the bankruptcy court) and plenary matters (to be reserved for Article III courts). *See* Ralph Brubaker, *A "Summary" Statutory and Constitutional Theory of Bankruptcy Judges' Core Jurisdiction After Stern v. Marshall*, 86 Am. Bankr. L.J. 121, 129-30 (2012).

Before *Stern,* the jurisdictional grant of authority in Section 157 had gone largely unchallenged since its enactment in 1984, almost thirty years ago. That is not quite true. In *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), the Supreme Court had defined bankruptcy court jurisdiction in the same way as the *Stern* court, but because the jurisdictional question arose in the context of a party's claim to a right to a jury trial, the lower courts construed *Granfinanciera* to be limited to the jury trial context. *Stern* made it clear that, in any context, Congress could not grant the bankruptcy court jurisdiction to hear matters traditionally reserved for Article III courts. What *Stern* did not answer, however, was what was to happen to the "core, but unconstitutional" matters. Certainly the bankruptcy court could not enter final orders on these matters, but could it make PFCs? Section 157 does not expressly grant the bankruptcy court any dispensation to handle this third category. It speaks only to its ability to hear "core" and "non-core" matters. Does the bankruptcy court lack statutory authority to hear the core, but unconstitutional matters?

Two circuit courts have waded into this breach. First, in *Executive Benefits Insurance Agency v. Arkison (In re Bellingham Insurance Agency, Inc.)*, 702 F.3d 553 (9th Cir. 2012), *cert. granted,* 133 S.Ct. 2880 (Jun. 24, 2013) (No. 12-1200), the parties asked the Ninth Circuit whether the bankruptcy court had jurisdiction to hear and finally determine a fraudulent conveyance claim. A fraudulent conveyance is expressly listed as a "core" matter as to which the bankruptcy court may render final rulings in § 157(b)(2). The *Bellingham* court held that, although a fraudulent conveyance is a "core" matter, it is nonetheless unconstitutional for the bankruptcy judge to render a final ruling. Despite the absence of express statutory authority to do anything with this third category, the Ninth Circuit concluded that the bankruptcy court could nevertheless enter PFCs. It further held that the parties could "waive" any constitutional infirmity and allow the bankruptcy court to enter final orders. Having granted a petition for certiorari to review the *Bellingham* decision, the Supreme Court will presumably address these questions in the near future.

In the meantime, the Seventh Circuit has entered the fray, holding that the parties' consent will not cure any unconstitutional infirmity because it implicates separation-of-powers

principles. *Wellness Int'l Network, Ltd. v. Sharif*, -- F.3d --, 2013 WL 4441926 (7th Cir. Aug. 21, 2013). In *Wellness*, the Seventh Circuit further held that the bankruptcy court lacked constitutional authority to enter final judgment on the creditor's alter ego claim, but remanded for a determination as to whether an alter ego claim was a core or non-core matter. Offering a road map on remand, the Seventh Circuit opined that, if it is a core matter, then the district court would have to withdraw the reference to hear the matter itself because § 157 does not provide a statutory grant of authority to the bankruptcy court to hear the third category of "core, but unconstitutional." In its view, the bankruptcy court could not even enter PFCs as to this third category.

The third circuit court decision to interpret *Stern, Waldman v. Stone*, 698 F.3d 910 (6th Cir. 2012), is more directly applicable to the case at hand. In *Waldman*, the debtor, Mr. Stone, had been swindled by Mr. Waldman. Waldman had promised Stone that he was merely buying a minority interest in Stone's business in exchange for repayment of the company's bank loan, but the closing documents prepared by Waldman's attorneys reflected a complete sale of the company's assets to Waldman and Waldman merely purchased the bank loan with no obligation to forgive it. Stone was not allowed to review the documents before closing and, despite repeated requests to Waldman to obtain copies after the closing, he was not given a set for over one year, and only then because another employee finally gave them to him. When Stone saw that he had been defrauded, the parties came to blows. Waldman then initiated collection actions against Stone, who had guaranteed the company bank debt, now held by Waldman. In response, Stone filed a chapter 11 bankruptcy, as well as an adversary proceeding seeking to disallow Waldman's claim and asserting a separate fraud claim for either specific performance or monetary damages. Both the bankruptcy court and the district court ruled in Stone's favor on both claims.

The Sixth Circuit, however, considered whether the bankruptcy court had had the jurisdiction to enter a final order on the debtor's fraud claim. Even though the fraud claim was intertwined with the disallowance claim, the court concluded that it was beyond the constitutional limits because a fraud claim is the "stuff" of Article III jurisdiction. The Sixth Circuit remanded the fraud claim back to the bankruptcy court to recast its order as PFCs to be submitted to the district court for *de novo* review. It allowed the bankruptcy court to do so because the fraud claim was a "related to," non-core matter. Thus, this decision did not require the court to decide whether a bankruptcy court could enter PFCs on a core, but unconstitutional matter.

The Tenth Circuit has yet to weigh in on these issues. In the absence of a binding precedent, but in light of these recent circuit decisions, the Court considers anew whether it has the authority to enter final orders on Ball Four's claims. Ball Four's "claim disallowance" claim for relief is clearly a "core matter," just as it was in *Waldman*. 28 U.S.C. § 157(b)(2)(B) (defining core matters to include "allowance or disallowance of claims against the estate."). It also fits within the historical concept of summary or *in rem* jurisdiction, which has always allowed the bankruptcy tribunal to adjudicate claims against the *res*. The equitable subordination claim is "core" as well. This claim arises under § 510 of the Bankruptcy Code and, therefore, "arises under" Title 11 of the United States Code. It also arguably falls within § 157(b)(2)(B), (K) (determinations of the validity, extent, or priority of liens), and (O), ("other proceedings affecting the . . . adjustment of the debtor-creditor . . . relationship"). Even if equitable

7

subordination does not fit squarely in the enumerated examples set forth in the statute, it fits within the traditional understanding of summary jurisdiction, which includes the adjudication of claims to the *res*. If a bankruptcy court can disallow a claim, it should be able to take the less drastic action of subordinating the claim. Moreover, subordination of a claim does not involve reaching outside the estate to bring assets back to the estate, which would implicate plenary jurisdiction. Thus, the Court has the authority to enter final orders as to Ball Four's claims for equitable subordination and claim disallowance.[2]

The fact that the Court has jurisdiction to hear two of the claims does not necessarily confer jurisdiction on it to hear the remaining claims. The other claims, like the counterclaim in *Stern*, do not have to be heard in order to determine the allowance of SIP's proof of claim. As previously stated, Ball Four has not challenged SIP's claim in any way. It has merely set forth its own claims that it asserts will offset SIP's claim. Thus, it is necessary to separately analyze the Court's jurisdiction over the remaining three claims. Just as the *Waldman* court concluded that the bankruptcy court could not enter final orders on the related fraud claim, so this Court concludes that it does not have jurisdiction to enter final orders on the breach of contract claims and breach of the implied duty of good faith and fair dealing claim (the "implied duty claim").

The breach of contract and implied duty claims are "related to," non-core matters. They do not arise in or under Title 11. They are "related to" the bankruptcy in the sense that they may augment the estate if Ball Four were to succeed on these claims, but these claims could exist outside of a bankruptcy proceeding. As non-core matters, the Court may hear the claims but it may not enter a final determination as to them. It may only enter PFCs. *De novo* review in the district court should satisfy the constitutional requirement that these plenary matters be heard by an Article III court.

### B.   Standard of Review

SIP seeks summary judgment on all of Ball Four's claims in this adversary proceeding on the basis that the Complaint fails to state a claim for which this Court can grant relief as a matter of law. Granting summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 7056). The moving party has "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2003). If the moving party makes a prima facie case, the burden then shifts to the non-moving party to set forth specific facts demonstrated by evidence, "from which a rational trier of fact" could find in its favor. *Whitesel v. Sengenberger*, 222 F.3d 861, 866 (10th Cir. 2000).

---

[2] An argument can be made that the Court does not even have authority to hear the disallowance and equitable subordination claims. Viewed in isolation, the Court clearly has the authority for the reasons stated above. But these two "claims" are essentially asserted as remedies for the breach of contract and breach of implied duty of good faith and fair dealing claims. If the Court lacks authority to finally determine the underlying claims, perhaps it lacks authority as to the correlative remedy "claims." This Court leaves this determination to the district court, who will have to review three of these claims *de novo* in any event.

8

### III. DISCUSSION

#### A. The Implied Covenant of Good Faith and Fair Dealing and the Tenth Circuit's ruling in *Alpine Bank v. Hubbell*

Colorado law recognizes that every contract contains an implied covenant of good faith and fair dealing. *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995). This "covenant may be relied upon only when the manner of performance under a specific contract term allows for discretion on the part of either party." *Id.* It prohibits a party from exercising the "discretion conferred by the contract to act dishonestly or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract." *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1363 (Colo. App. 1994). But the duty of good faith and fair dealing does not "contradict terms or conditions for which a party has bargained." *Amoco*, 908 P.2d at 498. As the Colorado court of appeals stated in *Wells Fargo*:

> [T]he duty of good faith and fair dealing does not obligate a party to accept a material change in the terms of the contract or to assume obligations that vary or contradict the contract's express provisions. Nor does the duty of good faith and fair dealing inject substantive terms into the parties' contract. Rather it requires only that the parties perform in good faith the obligations imposed by their agreement. . . .
>
> Each party to a contract has a justified expectation that the other will act in a reasonable manner in its performance. When one party uses discretion conferred by the contract to act dishonestly or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract, the contract is breached.

872 P.2d at 1363 (citations omitted). With respect to secured transactions, such as the one here, Colorado's Uniform Commercial Code defines "good faith" as "honesty in fact and the observance of reasonable commercial standards of fair dealing." Colo. Rev. Stat. § 4-9-102(43) (2012).

SIP argues that the Tenth Circuit's ruling in *Alpine Bank v. Hubbell*, 555 F.3d 1097 (10th Cir. 2009) is dispositive here. *Alpine Bank* involved a dispute regarding Alpine's obligations to oversee construction of a home being built in Colorado by its borrowers, the Hubbells, who lived out of state. The Hubbells allegedly relied on Alpine's advice in selecting a contractor for the job, as well as in determining whether advances should be made to pay progress payments. After approximately $800,000 of the $1.2 million loan had been disbursed to the contractor, the Hubbells discovered that the home was less than one-third complete, necessary permits had not been obtained, and the construction was so defective, it might be cheaper to tear the house down and start over than to repair the problems. When Alpine sued them for failure to repay the loan on maturity, the Hubbells counterclaimed against the bank for breach of contract, breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, fraudulent non-disclosure and violation of the Colorado Consumer Protection Act. Like the Agreement here, the loan agreement between the Hubbells and Alpine contained provisions allowing Alpine to make disbursements directly to contractors in its sole discretion.

While acknowledging that the loan agreement gave Alpine discretion regarding the extent to which it would oversee construction before making disbursements, the Hubbells contended that Alpine had violated the implied covenant of good faith and fair dealing by failing to notify them how it would be exercising its discretion.  The Tenth Circuit acknowledged that, under Colorado law every contract contains an implied duty of good faith and fair dealing prohibiting a party from exercising "discretion conferred by the contract to act dishonestly or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract." *Id.* at 1104 (citing *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1363 (Colo. App. 1994)).  However, the Tenth Circuit rejected the Hubbell's contention that Alpine had violated its implied duty of good faith and fair dealing, because the duty they were seeking to impose was contrary to the terms of the limitation of responsibility provision in their loan agreement.  Looking at the language of the limitation of responsibility provision in the Hubbells' loan agreement, which is identical to the provision here in all material respects, the Tenth Circuit held:

> This language protects the Bank from any liability for failures in determining the propriety of advances.  To impose liability on the Bank for not disclosing its failure to the Hubbells would be inconsistent with that provision.  We must keep in mind that "[t]he good faith performance doctrine is generally used to effectuate the intentions of the parties or to honor their reasonable expectations." *Amoco Oil*, 908 P.2d at 498.  It would beggar the imagination to believe that the Bank, after making so clear in the Limitation of Responsibility provision that it owed the Hubbells no duty to oversee construction, was assuming a duty to inform the Hubbells whenever, intentionally or through inadvertence, it failed to check on something before disbursing funds. . . .  Accordingly, we affirm the district court's award of summary judgment to the Bank on the Hubbells' breach-of-contract counterclaim.

*Id.* at 1105.

It is possible to distinguish *Alpine Bank* from the present case.  Unlike the borrower in *Alpine Bank*, Ball Four is not seeking to impose liability on SIP based on the Bank's failure to determine, on its own, the propriety of the advances prior to making them.  Nor was it relying on the Bank to oversee construction of the project or ensure proper completion of work before payment was made.  In fact, quite the opposite.  Ball Four was closely monitoring the construction.  It specifically requested that the Bank *not* make the disputed disbursements because the work and materials for which the disbursements were to be made did not conform to the requirements of the plans and specifications.  Ball Four acknowledges that the Bank had discretion in deciding when to make advances, but after receiving information that the work performed was substantially improper or defective, it contends that the Bank did not act in a commercially reasonable manner by exercising its discretion to go ahead and make these advances to contractors.

In this Court's view, there is no provision in the Agreement that would absolve the Bank from any and all liability attributable to making advances.  It speaks only to the fact that, when the Bank advances payments, the advance does not constitute "an approval or acceptance by Lender of the work done through the date of the Advance," nor "a representation or indemnity by

Lender to any party against any deficiency or defect in the work." Ex. A, at 4. The problem with this Court's interpretation, however, is that the *Alpine Bank* court construed the exact same language to be a complete disclaimer of liability. "This language protects the Bank from any liability for failures in determining the propriety of advances." *Alpine Bank*, 555 F.3d at 1105. Much like the rock, paper, scissors game, what would otherwise be this Court's interpretation must give way to the interpretation given to this language by the Tenth Circuit. Reluctantly then, the Court recommends the entry of summary judgment dismissing this claim. Allowing Ball Four to bring this claim to trial would directly contradict the Agreement's disclaimer provision, and the implied covenant of good faith and fair dealing can never be used to contradict express terms of a contract.

      **B.**      **Breach of the Construction Loan Agreement**

Like most of Ball Four's claims, its first claim for breach of contract is based on the Bank's payments to the contractor and subcontractors despite Ball Four's explicit request such payments not be made due to defects in performance. Ball Four argues that the Agreement is ambiguous, requiring the Court to take evidence of the parties' intent and precluding summary judgment. Under Colorado law, the intent of the parties is determined by examining the contract in its entirety. If its meaning is clear and unambiguous, the contract is enforced as written. If it is susceptible of more than one reasonable interpretation, it is ambiguous and its meaning must be determined as an issue of fact. *Bloom v. Nat'l Collegiate Athletic Ass'n*, 93 P.3d 621, 625 (Colo. App. 2004). The determination of whether a contract is ambiguous is a question of law. *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 912 (Colo. 1996).

Despite Ball Four's arguments to the contrary, the Court does not find it is necessary to receive evidence to determine the parties' intent. While Ball Four has pointed to various terms of the Agreement giving the Bank the right to decline to make disbursements or even stop work on the project due to unsatisfactory construction or materials, it has not directed this Court's attention to any provisions requiring the Bank to insist on proof of such compliance before disbursing funds, either at Ball Four's request or on its own impetus. Nor has it pointed to any provision of the loan documents obligating the Bank to withhold payments to contractors and subcontractors at Ball Four's request or direction. Rather, the specific terms of the Agreement gave the Bank the right to do exactly what it did — make payments directly to contractors at its sole option.

Thus, there are no issues of fact regarding the written provisions of the Agreement itself. None of the provisions pointed out by Ball Four are inconsistent with or contradict one another to create an ambiguity. Although pled as a separate claim for relief, Ball Four's first claim for relief is really nothing more than a duplicative claim for the alleged breach of the implied covenant of good faith and fair dealing. Accordingly, the Court recommends that summary judgment be granted in SIP's favor on the first claim for relief.

      **C.**      **Breach of Agreement to Make a Permanent Loan**

Ball Four's second claim for relief alleges that the Bank breached the September 12, 2005 letter from the Bank to Ball Four entitled "Permanent Loan Commitment" (the "Commitment Letter"). Ex. C. A commitment letter "is essentially an option which may be

11

exercised by the borrower, but only in strict compliance with its terms." *Concord Realty Co. v. Continental Funding Corp.*, 776 P.2d 1114, 1118 (Colo. 1989). A review of the Commitment Letter and the other loan documents attached to the Motion, as well as the admissions in this case, demonstrate that summary judgment should also be granted on this claim.

Although titled "Permanent Loan Commitment," a review of the timing and express terms of the Commitment Letter leads this Court to conclude that the financing described by the letter consists of the same terms and conditions that were imposed in the Construction Loan entered into between the Bank and Ball Four. In fact, the title is the only language in the Commitment Letter that is inconsistent with the terms of the Agreement. The Commitment Letter is dated September 12, 2005, ten days before the Construction Loan was made on September 22, 2005. *See* Exs. A, B. The loan amount is identical—$1,950,000—as is the interest rate of prime plus 1% and a term of 36 months "for review and extension." It is also undisputed that the Construction Loan was extended more than once. *See* Ex. D (extending the maturity date to March 19, 2009). The Commitment Letter specifies payment terms of "[i]nterest only for 6 months. Then principal and interest – based on a full 15 year amortization. Payments will be begin [sic] April." Ex. C, at 1. The promissory note for the Construction Loan shows a 36-month loan with interest-only payments, followed by monthly principal and interest payments beginning on April 2, 2006, and a balloon payment of $1,784,690.12 due on September 2, 2008. Ex. B. Further, it is clear that the Commitment Letter was drafted with an eye to the construction to be done on Ball Four's property. It states the purpose of the proposed financing as: "Payoff existing credit facility with 1st National Bank of Arvada and construct a 22,750 sq ft domed facility on present 16.93 acre site." Ex. C, at 1. The description of the collateral for the contemplated loan also states, in relevant part:

> IT [sic] is proposed to remove one of the softball fields and on that space install a 22,750 square foot one-story fabric covered building. The dome will be supported by a structural steel purlin engineered frame. The dome will have sports court floor and can house six basketball courts along with the restaurant area and bar area.

*Id*. The additional requirements for the proposed financing included "3. Detailed construction budget and acceptance of that budget." *Id.* Finally, the Commitment Letter states: "We appreciate the opportunity to provide the financing for the expansion of Ball Four dba as Softball County [sic] as described above." *Id*.

In support of its argument that the Commitment Letter was an agreement to provide permanent financing, not merely short-term construction financing, Ball Four has attached excerpts from a deposition of Grail Kister, the Bank officer who signed the Commitment Letter. Ex. 2. Ball Four characterizes Mr. Kister's deposition testimony as "replete with acknowledgements" that the Bank at all times committed to provide permanent financing. The attached deposition excerpts, however, do not paint such a picture, even when read in the light most favorable to Ball Four. Although he confirmed that the Commitment Letter was titled "Permanent Loan Commitment," Mr. Kister did not actually characterize the Commitment Letter as a commitment for permanent financing, instead referring to it rather obliquely as "Permanent construction to the permanent." Ex. 2, p. 65, ll. 24-25. He also testified that permanent financing was "offered" but not accepted, Ex. 2, p. 64, l. 15 - p. 65, l. 4; *see also* p. 66, l. 3, and

12

stated that "[a]t the end of the day, it was the *desire* to do permanent financing on the Ball Four operation." Ex. 2, p. 75, ll. 9-11 (emphasis added). All of this falls far short of demonstrating an enforceable option to obtain permanent financing that could be exercised by Ball Four.

Even if the Commitment Letter was an enforceable option for permanent financing, Ball Four was not entitled to exercise that option due to its defaults on the Construction Loan. The Agreement specifies that the Bank was not required to make any advances or loans "whether under this Agreement or any other agreement" if Ball Four was in default. Ex. A, at 4. It is clear from the admissions on file that Ball Four was in default on the Construction Loan. The Complaint itself admits that Ball Four was in default under the Agreement, stating payment of $64,000 was required to bring the loan current, Complaint, at ¶ 39, as well as demonstrating that construction was not done in accordance with the plans and specifications as required. Complaint, at ¶¶ 21-24, 28-30, and 33-35. Further, the Construction Loan matured on March 19, 2009, but has not been paid. Ex. D.

The Response attempts to negate these admissions of default by arguing that Ball Four had a right to cure which the Bank failed to give it. While this may be true as to the construction defects, the same cannot be said of the payment defaults. The Right to Cure provision relied on by Ball Four specifically provides:

> If any default, *other than a default on indebtedness*, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, It [sic] may be cured if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (1) cure the default within twenty (20) days; or (2) if the cure requires more than twenty (20) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

Ex. A, at 7 (emphasis added). Strangely, the Agreement did not contain a separate cure provision for payment defaults, nor did any of the other loan documents. Thus, Ball Four's failure to make payments as required by the Construction Loan and failure to pay the loan on maturity were events of default that relieved the Bank from any obligation to make any further loans or advances "whether under this Agreement or under any other agreement." *Id.* at 4. As a result, the Court recommends the granting of summary judgment in favor of SIP as to this claim.

### D.     Equitable Subordination

The Complaint further asserts that the Bank's conduct in paying the disputed distributions "resulted in an unfair advantage to the Defendant and injury to Ball Four's other creditors. As such, it constitutes inequitable conduct under the principals of equitable subordination." Complaint, at ¶ 64. Section 510(c) of the Bankruptcy Code provides, in relevant part:

> Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may –

>    (1) Under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim . . . .

11 U.S.C. § 510(c). The Tenth Circuit has adopted the three-part test set forth in the leading case on equitable subordination, *In re Mobile Steel*, 563 F.2d 692 (5th Cir. 1977), to determine whether equitable subordination is appropriate. A party seeking equitable subordination under § 510(c) must demonstrate:

>    1. The claimant has engaged in inequitable conduct;
>
>    2. The conduct has injured creditors or given unfair advantage to the claimant; and
>
>    3. Subordination of the claim is not inconsistent with the Bankruptcy Code.

*Sloan v. Zions First Nat'l Bank* (*In re Castletons, Inc.*), 990 F.2d 551, 559 (10th Cir. 1993). In adopting the *Mobile Steel* standard, the Tenth Circuit placed special emphasis on the inequitable conduct prong. "The critical inquiry ... is whether there has been inequitable conduct on the part of the party whose debt is sought to be subordinated." *Id*. (citation omitted).

"Inequitable conduct" for subordination purposes encompasses three categories of misconduct: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego. *In re Hedged-Investments Assoc., Inc.*, 380 F.3d 1292, 1301 (10th Cir. 2004). It is not enough to simply allege that a defendant engaged in "inequitable conduct." The party seeking equitable subordination must allege conduct that fits within one of these three categories. *In re Eufaula Indus. Auth.*, 266 B.R. 483, 489 (10th Cir. BAP 2001). Further, different levels of scrutiny are applied to "insiders" and "non-insiders" of the Debtor.

>    Where the claimant is an insider or a fiduciary, the party seeking subordination need only show some unfair conduct, and a degree of culpability, on the part of the insider. If the claimant is not an insider or a fiduciary, however, the party seeking subordination must demonstrate even more egregious conduct such as gross misconduct tantamount to fraud, misrepresentation, overreaching or spoliation.

*In re Hedged-Investments*, 380 F.3d at 1301-02 (citations and internal quotations omitted).

Ball Four has not alleged that the Bank was an insider or fiduciary. In fact, Ball Four's Response specifically states that it is not alleging any liability based on the "attorney-in-fact" language in the Payments paragraph of the Agreement, Response, at 16, or any claims based on a special trust relationship with the Bank, Response, at 31. Accordingly, Ball Four must be able to demonstrate the Bank's conduct demonstrates egregious conduct such as "gross misconduct tantamount to fraud, misrepresentation, overreaching or spoliation," *In re Hedged-Investments*, 380 F.3d at 1301-02, or "involving moral turpitude," *In re Eufaula*, 266 B.R. at 489.

The circumstances where equitable subordination applies to a non-insider creditor are "few and far between." *Id*. (citing *Kham & Nate's Shoes No. 2, Inc. v. First Bank*, 908 F.2d

1351, 1356 (7th Cir. 1990)). The level of egregious conduct necessary for equitable subordination of a non-insider's claim is high. Even independently tortious and fraudulent conduct does not necessarily rise to the level required for equitable subordination in bankruptcy. *In re First Alliance Mortg. Co.*, 471 F.3d 977, 1007 (9th Cir. 2006). The conduct at issue must rise above bad faith or inequitable conduct to "shock the conscience of the court," must be proven with particularity, and must detrimentally affect other creditors. *Id.*; *In re 604 Columbus Ave. Realty Trust*, 968 F.2d 1332, 1360-61 (1st Cir. 1992).

The Court finds that the facts alleged in support of the claimed breach of the covenant of good faith and fair dealing alleged here are legally insufficient to justify equitable subordination under the high standard imposed by the Tenth Circuit. The only conduct alleged to support this claim is the same conduct of paying contractors notwithstanding Ball Four's explicit requests to the contrary. Having already determined that the Bank was contractually permitted to pay the contractors, this conduct cannot give rise to a basis for equitable subordination. Such conduct, without more, does not "shock the conscience of the court," especially since the contract allowed the Bank to do what it did. Nor would making the payments to contractors constitute "gross misconduct tantamount to fraud, misrepresentation, overreaching or spoliation," as is required to equitably subordinate the claim of a non-insider, non-fiduciary in the Tenth Circuit. *In re Hedged-Investments*, 380 F.3d at 1301-02. Therefore, the Court grants summary judgment, dismissing this claim.

### E.  Disallowance of the Claims

Ball Four's final claim for relief seeks disallowance of all of SIP's claims pursuant to 11 U.S.C. § 502(b)(1). That section provides for the disallowance of a claim to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law . . . ." 11 U.S.C. § 502(b)(1). The Complaint asserts that SIP's claims should be disallowed "because FirsTier Bank violated the laws stated herein with respect to the underlying Loan, including conduct which constituted breach of contract and/or breach of implied covenant of good faith and fair dealing . . . ." Complaint at ¶71. Ball Four did not cite any law in support of the Complaint's proposition that the proper remedy for a breach of contract or breach of the implied covenant of good faith and fair dealing is to render the Construction Loan unenforceable. Nor did the Court find any such case law. Rather, it appears that even if Ball Four were allowed to proceed to trial and was ultimately successful on its claim that the Bank breached the implied covenant of good faith and fair dealing, the remedy for such a breach would be an award of monetary damages. A damage award in Ball Four's favor would provide a basis for offset of the Construction Loan in whole or in part, and theoretically it might even result in the Bank owing money to Ball Four, but it would not invalidate the loan. Ball Four has not disputed that it owes money on this loan, only that it has an offsetting claim. Section 502(b)(1) would be implicated only if Ball Four had asserted some basis for rendering the Construction Loan unenforceable, such as a statute of limitation, usury laws, or the like. Accordingly, SIP is entitled to summary judgment on Ball Four's fifth claim for relief.

### IV.  CONCLUSION

For the reasons set forth above, it is hereby

ORDERED that:

(1) The Court enters final rulings granting the Defendant's Motion for Summary Judgment as to the fourth (equitable subordination) and fifth (claims disallowance) claims for relief. Such claims for relief are hereby DISMISSED.

(2) The Court enters proposed findings and conclusions, recommending the grant of summary judgment and dismissal of the first, second, and third claims for relief.

Dated this 30th day of September, 2013.

BY THE COURT:

_Elizabeth E. Brown_
Elizabeth E. Brown, Bankruptcy Judge