IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 13-cv-02810-RBJ

BALL FOUR, INC.,

 Plaintiff-Appellant,

v.

2011-SIP-1 CRE/CADC VENTURE, LLC,

 Defendant-Appellee.

## ORDER

  This case comes before the Court on Ball Four, Inc.'s Partial Objection to Bankruptcy Court's Proposed Findings and Conclusions [ECF No. 23] pursuant to 28 U.S.C. § 157(c). The matter became ripe for review on May 2, 2014 upon Ball Four, Inc.'s filing a Reply. Also pending is Ball Four's Motion for Leave to Appeal Pursuant to Bankruptcy Rule 8003 [ECF No. 2], over which the Court exercises jurisdiction pursuant to 28 U.S.C. § 158(a).

## PROCEDURAL POSTURE

  On January 17, 2012 Ball Four filed a complaint against 2011-SIP-1 CRE/CADC Venture, LLC ("SIP") in a Chapter 11 bankruptcy proceeding. [ECF No. 23-1 at 1–7; Case No. 10-33952-EEB Chapter 11, Adversary Proceeding No. 12-01036-EEB]. Ball Four asserted five claims. [ECF No. 23-1 at 5]. SIP moved for summary judgment dismissing all claims. *Id.* at 13–29. On September 30, 2013, the United States Bankruptcy Court, Hon. Elizabeth E. Brown, entered final orders granting summary judgment in favor of SIP on two "core" (bankruptcy) claims and, pursuant to *Stern v. Marshall*, 131 S. Ct. 2594 (2011), entered proposed findings of

fact and conclusions of law, and a recommendation that summary judgment be granted in favor of SIP on the three "non-core" (state law) claims. [ECF No. 23-2 at 69–84; Case No. 10-33952-EEB Chapter 11, Adversary Proceeding No. 12-01036-EEB]. Those proposed findings of fact and conclusions of law are subject to de novo review by this Court. 28 U.S.C. § 157(c). Ball Four asks this Court to take its appeal from the dismissal of the core claims at the same time that it reviews the non-core claims.

Because it appeared that the fate of all five claims potentially hinged on this Court's analysis of Ball Four's claim that SIP's predecessor, FirsTier Bank, breached a covenant of good faith and fair dealing implied in a loan agreement (Ball Four's Third Claim for Relief), the Court asked the parties to begin by briefing just that issue. The Court concludes that summary judgment should not have been granted on that claim and therefore remands the case to the Bankruptcy Court for further proceedings.

## BACKGROUND

Ball Four set out to build a sports complex in North Denver. To do so, it obtained a construction loan in the amount of $1,950,000 from FirsTier Bank. SIP later purchased the loan from the FDIC in its capacity as receiver for FirsTier Bank. The Loan Agreement provided for FirsTier, in its discretion, to make advances (payments) to the construction contractors. However, the Loan Agreement also made it clear that any discretionary payment should not be interpreted as an approval or acceptance of the work done up until that point or a representation against any deficiency or defect in the work.

Ball Four closely monitored the construction of its sports complex. According to its Complaint in the underlying bankruptcy action [*See* ECF No. 23-1 at 1–7], Ball Four found a number of problems with the work being performed, including safety hazards arising from the

2

use of incorrect building materials in the bathrooms; potential hazards arising from the failure to construct a specified foyer; the installation of an inferior quality turf in the indoor soccer fields; and the failure properly to install concrete under the structure and in the parking lot, leading to numerous cracks. *Id.* at 3–4 (¶¶ 20–36). When it discovered these problems, it explained the situation to FirsTier and directed the bank to stop making payments to those contractors.

However, despite those instructions, FirsTier continued to make payments to the contractors, at one point even issuing a second check after Ball Four made a stop payment on the first one. Ball Four asserts that by continuing to make these payments, FirsTier breached the covenant of good faith and fair dealing implied in the Loan Agreement. SIP responds that the express terms of the Loan Agreement waive any liability for making these advances, and that the claim must be dismissed.

There are two relevant provisions: the Payments provision and the Limitation of Responsibility provision.

The Payments provision reads:

> At the sole option of Lender, Advances may be paid in the joint names of Borrower and the General Contractor, subcontractor(s), or supplier(s) in payment of sums due under the Construction Contract. At its sole option, Lender may directly pay the General Contractor and any subcontractors or other parties the sums due under the Construction Contract. Borrower appoints Lender as its attorney-in-fact to make such payments. This power shall be deemed coupled with an interest, shall be irrevocable, and shall survive an Event of Default under this Agreement.

[ECF No. 23-1 at 33].

The Limitation of Responsibility provision reads:

> The making of any Advance by Lender shall not constitute or be interpreted as either (A) an approval or acceptance by Lender of the work done through the date of the Advance, or (B) a representation or indemnity by Lender to any party against any deficiency or defect in the work or against any breach of any contract.

3

> Inspections and approvals of the Plans and Specifications, the Improvements, the workmanship and materials used in the Improvements, and the exercise of any other right of Inspection, approval, or inquiry granted to Lender in this Agreement are acknowledged to be solely for the protection of Lender's interests, and under no circumstances shall they be construed to impose any responsibility or liability of any nature whatsoever on Lender to any party.  Neither Borrower nor any contractor, subcontractor, materialman, laborer, or any other person shall rely, or have any right to rely, upon Lender's determination of the appropriateness of any Advance.  No disbursement or approval by Lender shall constitute a representation by Lender as to the nature of the Project, its construction, or its intended use for Borrower or for any other person, nor shall it constitute an indemnity by Lender to Borrower or any other person against any deficiency or defects in the Project or against any breach of contract.

[ECF No. 23-1 at 32].

According to Ball Four, the problems with the construction coupled with the advances made by FirsTier caused Ball Four to run out of money, resulting in its ceasing construction and filing bankruptcy.

## LEGAL STANDARD

Colorado recognizes that every contract contains an implied duty of good faith and fair dealing.  *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995).  This duty extends to credit agreements.  *See Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1363 (Colo. App. 1994).  The duty of good faith and fair dealing applies when the contract grants one party discretion in its performance, that is, in its "power after contract formation to set or control the terms of performance."  *Amoco Oil,* 908 P.2d at 498. (internal quotation marks and citation omitted).  "The duty of good faith and fair dealing 'prohibits a party from exercising discretion conferred by the contract to act dishonestly or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract.'"  *Knowles v. Bank of Am., N.A.*, No. 12-CV-00621-RBJ, 2012 WL 5882570, at *3 (D. Colo. Nov. 21, 2012) (quoting *Wells Fargo*, 872 P.2d at 1363).  "Generally, the good faith performance doctrine may be used to protect a

4

'weaker' party from a 'stronger' party." *Amoco Oil*, 908 P.2d at 498. Weakness and strength, however, do not refer to the relative bargaining power of the parties. The stronger party is the one that exercises the discretion over the contract term. *Id.* at 498–99. In turn, the weaker or dependent party is "left to the good faith of the party in control." *Id.* at 499.

"Good faith performance of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Wells Fargo*, 872 P.2d at 1363. "A party's justified expectations are violated if evidence indicates it would not have signed the contract had it known of the manner in which the party given discretion would exercise its discretion to determine open terms under a contract." *ADT Sec. Servs., Inc. v. Premier Home Prot., Inc.*, 181 P.3d 288, 293 (Colo. App. 2007). "Under Colorado law, the implied duty of good faith and fair dealing limits a party's ability to 'act unreasonably in contravention of the other party's *reasonable expectations*,' even if the express terms of a contractual provision appear to permit unreasonable actions." *Cobank, ACB v. Reorganized Farmers Co-op. Ass'n.*, 170 F. App'x 559, 565 (10th Cir. 2006) (unpublished) (emphasis in original) (citing *Duffield v. First Interstate Bank of Denver, N.A.*, 13 F.3d 1403, 1405–06 (10th Cir. 1993)).

On the other hand, "the duty of good faith cannot be used to contradict terms or conditions for which a party has bargained." *ADT*, 181 P.3d at 293 (citing *Amoco Oil*, 908 P.2d at 498). "The doctrine does not obligate a party to accept a material change in the terms of the contract, or to assume obligations that vary or contradict the contract's express provisions, nor does it permit a party to inject substantive terms into the contract." *Id.*

## DISCUSSION

### The Loan Agreement

The issue in this case is whether the express terms of the Loan Agreement disallow Ball Four's implied covenant of good faith claim. On their face, they do not.

Looking at the plain language of the Loan Agreement, FirsTier disclaimed liability insofar as the payment of an advance could be seen as (a) an approval or acceptance of the work done through the date of the advance, or (b) as a representation or indemnity against any deficiency or defect in the work. The remaining terms of the Limitation of Responsibility provision, insofar as they relate to the payment of advances, simply add detail to the two basic disclaimers. SIP tries to characterize Ball Four's claims as triggering these disclaimer terms. But Ball Four is not arguing that FirsTier's payments constituted approvals of the construction or an indemnity against defects in the workmanship. Instead, it claims FirsTier breached its duty of good faith when it made the payments in spite of being told not to do so because the work was defective. The Court finds nothing in the disclaimers concerning payment of advances that would waive SIP's liability for FirsTier's having continued to make these payments on those facts.

SIP focuses instead on the following language:

Inspections and approvals of the Plans and Specifications, the Improvements, the workmanship and materials used in the Improvements, and the exercise of any other right of Inspection, approval, or inquiry granted to Lender in this Agreement are acknowledged to be solely for the protection of Lender's interests, and under no circumstances shall they be construed to impose any responsibility or liability of any nature whatsoever on Lender to any party.

[*See* ECF No. 26 at 3 n.7]. But that misses the point. Ball Four is not claiming that SIP has liability because FirsTier inspected or approved the plans or the work in progress. Its claim is

6

that FirstTier exercised its payment discretion unreasonably when it ignored Ball Four's instructions to stop making payments.

SIP also argues that no one, including Ball Four, can rely on FirsTier's decision that an advance is appropriate. It cites the following in support, also taken from the Limitation of Responsibility provision:

> Neither Borrower nor any contractor, subcontractor, materialman, laborer, or any other person shall rely, or have any right to rely, upon Lender's determination of the appropriateness of any Advance.

[ECF No. 23-1 at 32]. This too misses the point. Ball Four did not rely on FirsTier's determination of the appropriateness of the payments. Rather, it alleges that it carefully oversaw the construction process, informed FirsTier of serious construction defects, and asked FirsTier to withhold payments while Ball Four negotiated with the contractors to fix the work.

I also note that the Payments provision includes no waiver of liability. It states:

> At its sole option, Lender may directly pay the General Contractor and any subcontractors or other parties the sums due under the Construction Contract. Borrower appoints Lender as its attorney-in-fact to make such payments. This power shall be deemed coupled with an interest, shall be irrevocable, and shall survive an Event of Default under this Agreement.

[ECF No. 23-1 at 33]. This provision grants discretion to FirsTier, and therefore, it also mandates that the discretion be exercised in good faith. Simply put, any payments made to contractors or other parties due under the construction contract *must* be made in good faith.

Finally, though neither party discussed it, the Cessation of Advances provision also could be read as supporting Ball Four's claim. It states:

> If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; . . . .

7

[ECF No. 23-1 at 32]. It is an event of default if "[t]he Improvements are not constructed in accordance with the Plans and Specifications or in accordance with the terms of the Construction Contract." [ECF No. 23-1 at 35]. Making payments to contractors whose work was not in accordance with the plans and specifications of the construction contract arguably put Ball Four into a default position. It would defy logic for the Agreement to permit FirsTier to refuse to make loan advances to Ball Four if it is in default while simultaneously allowing FirsTier to cause Ball Four to enter into default.

In sum, FirsTier demanded the discretion to disburse or withhold advances as it saw fit, as evidenced by the Payments provision. FirsTier must exercise that discretion in good faith. Demanding that it do so does not place an obligation on FirsTier to act for the benefit of Ball Four, as SIP contends. But it does prohibit FirsTier from acting "outside of accepted commercial practices to deprive the other party of the benefit of the contract.'" *Knowles*, No. 12-CV-00621-RBJ, 2012 WL 5882570, at *3 (quoting *Wells Fargo*, 872 P.2d at 1363). At this stage of the case we do not have much, if any, evidence about "accepted commercial practices" in the context of a construction project where a bank is insisting on continuing to pay contractors despite the developer/borrower's protest that the construction work is shoddy. But by disbursing advances over Ball Four's objection, even to the point of reversing a stop payment that Ball Four had placed on one of the checks, FirsTier at least arguably acted outside of accepted commercial practices to deprive Ball Four of the benefit of the contract.

### The Bankruptcy Court Decision and *Alpine Bank*

The Bankruptcy Court reluctantly recommended that this Court find that the terms of the Loan Agreement bar the good faith claim, basing its decision on its reading of a recent Tenth Circuit case, *Alpine Bank v. Hubbell*, 555 F.3d 1097 (10th Cir. 2009). [ECF No. 23-2 at 77–79,

8

Case No. 10-33952-EEB Chapter 11, Adversary Proceeding No. 12-01036-EEB]. I understand the court's reluctance. Tenth Circuit decisions are, of course, binding on that court and on this one. Although the Bankruptcy Court did state that that the *Alpine Bank* ruling could be distinguished, *In re Ball Four, Inc.*, No. 10-33952 EEB, 2013 WL 5716889, at *8 (Bankr. D. Colo. Oct. 18, 2013), it also recognized that the panel interpreted the disclaimers in standard-form loan agreements broadly. I agree, but I also conclude that the case not only can be but should be distinguished from this case because we are presented with a materially different set of facts.

In *Alpine Bank*, the Hubbells took out a $1,280,000 construction loan from Alpine Bank ("the Bank") in order to build their dream home. *Id.* at 1100. The Hubbells, who lived out of state, obtained assurances from the Bank that its agents would oversee construction and make appropriate disbursements on the loan. *Id.* at 1101. After about $800,000 had been disbursed to the contractor, the Hubbells discovered that the home was less than one-third complete, that necessary permits had not been obtained, and that it might be cheaper to tear down the home and start all over than to repair the mistakes that had been done. *Id.* at 1100. The Bank sued the Hubbells when they failed to repay the loan, and the Hubbells counterclaimed on a number of theories, including breach of contract. *Id.* In particular, the Hubbells argued that the Bank's failure to oversee the construction was a breach of the implied covenant of good faith and fair dealing. *Id.* at 1101. The court found that this claim was barred by the Limitation of Responsibility provision in the Construction Loan Agreement. *Id.*

The language of the Limitation of Responsibility provision in the Hubbells' loan agreement is identical (except for the names of the lender and borrower) to the same provision in the Ball Four Loan Agreement, quoted above. *Id.* at 1102.[1]

The Hubbells signed a construction agreement with Carney Brothers Construction at the strong recommendation of the Bank, and construction began on the house in May 2003. *Id.* Between May and December 2003, the Bank's Assistant Vice-President made six or seven inspections of the construction site. The Hubbells contended that the extent of the oversight was inadequate. They also complained that the Bank did not confirm that the amounts drawn on the loan matched the percentage of work performed. *Id.* They acknowledged that the Loan Agreement gave the Bank discretion regarding the extent to which it would oversee construction before making disbursements. *Id.* at 1104. But they argued that the Bank violated the implied covenant of good faith and fair dealing when it failed to notify them of how it would be exercising that discretion. *Id.* The district court granted summary judgment in favor of the Bank, and the Tenth Circuit affirmed. *Id.*

The Tenth Circuit panel reasoned that while the Loan Agreement "permitted the Bank to oversee construction, granting it the right to deny advances to the contractor until the satisfaction of various conditions, such as its receipt of necessary permits and its approval of the contractor and of the contractor's progress," it "also gave the Bank the right *not* to insist on these conditions." *Id.* (emphasis added).

---

[1] The Hubbells' Loan Agreement also included a clause stating that "the Bank could, 'at its sole option,' disburse funds directly to the contractor," *id.* (alteration omitted), just like the Payments provision in this case. However, the Tenth Circuit based its decision on the wording of the Limitation of Responsibility provision, noting that it was "[o]f central importance to the dispute" as it "attempted to eliminate the Bank's liability to anyone for its actions relating to the inspection of construction and the advance of funds." *Id.*

The Hubbells argued that the covenant of good faith and fair dealing "obligated [the Bank] to tell the Hubbells if it was not going to do so, so that the Hubbells could take other steps to protect themselves." *Id.* But the court found for the Bank on grounds that the duty of good faith and fair dealing "does not obligate a party to accept a material change in the terms of the contract or to assume obligations that vary or contradict the contract's express provisions." *Id.* at 1104–05. It found that the duty the Hubbells were trying to impose was contrary to the terms of the Loan Agreement because the Limitation of Responsibility provision included this sentence:

> The making of any Advance by [the Bank] shall not constitute or be interpreted as either (A) an approval or acceptance by [the Bank] of the work done through the date of the Advance, or (B) a representation or indemnity by [the Bank] to any party against any deficiency or defect in the work or against any breach of contract.

*Id.* at 1105. Further, the right to oversight of the construction project was expressly acknowledged to be solely for the protection of the Bank's interests and not to be construed under any circumstances to impose liability on the Bank to any third party. *Id.* The Hubbells therefore waived any right to rely upon the Bank's determination of the appropriateness of any advance insofar as it reflected on the adequacy of the construction. *Id.*

The court concluded that the language of the Loan Agreement "protects the Bank from any liability for failures in determining the propriety of advances. To impose liability on the Bank for not disclosing its failures to the Hubbells would be inconsistent with that provision." *Id.* Because the good faith performance doctrine is typically used to effectuate the intentions of the parties or to honor their reasonable expectations, "[i]t would beggar the imagination to believe that the Bank, after making so clear in the Limitation of Responsibility provision that it owed the Hubbells no duty to oversee construction, was assuming a duty to inform the Hubbells whenever, intentionally or through inadvertence, it failed to check on something before

11

disbursing funds." *Id.* Simply put, the purpose of the Limitation of Responsibility provision was "to inform the Hubbells that they have no right to rely on the Bank with respect to overseeing construction." *Id.*

The *Alpine Bank* ruling is not dispositive here. First, unlike the Hubbells, Ball Four "is not seeking to impose liability on SIP based on the Bank's failure to determine, on its own, the propriety of the advances prior to making them." *In re Ball Four, Inc.*, No. 10-33952 EEB, 2013 WL 5716889, at *8 (Bankr. D. Colo. Oct. 18, 2013). Second, Ball Four was not "relying on the Bank to oversee construction of the project or ensure proper completion of work before payment was made." *Id.* Instead, Ball Four was monitoring the construction and "specifically requested that the Bank *not* make the disputed disbursements because the work and materials for which the disbursements were to be made did not conform to the requirements of the plans and specifications." *Id.* Third, as the Bankruptcy Count found, "there is no provision in the Agreement that would absolve the Bank from any and all liability attributable to making advances." *Id.* at *9. Instead, the Loan Agreement "speaks only to the fact that, when the Bank advances payments, the advance does not constitute 'an approval or acceptance by Lender of the work done through the date of the Advance,' nor 'a representation or indemnity by Lender to any party against any deficiency or defect in the work.'" *Id.* (citing the Limitation of Responsibility provision).

Why then did the bankruptcy court propose a finding in SIP's favor? Because it found one line in the *Alpine Bank* case to be dispositive: "This language protects the Bank from any liability for failures in determining the propriety of advances." *Id.* (citing *Alpine Bank*, 555 F.3d at 1105). However, the context of that statement must be taken into account. In the Circuit's words, "[t]he whole thrust of the Limitation of Responsibility provision is to inform the Hubbells

that they have no right to rely on the Bank with respect to overseeing construction.  Given the Bank's contractual immunity from liability to the Hubbells for failure to oversee construction, we cannot read into the Loan Agreement an implied duty of notice that would permit any claim of failure of oversight to be repackaged as a claim of failure to notify the Hubbells of the failure of oversight." *Alpine Bank*, 555 F.3d at 1105.  Nothing in the *Alpine Bank* decision suggests that the Tenth Circuit believed the Limitation of Responsibility provision would necessarily extend to claims such as those made by Ball Four in this action.  As discussed earlier, the applicable provision in this case is the Payments provision, which contains no waiver of liability.

SIP contends that *Alpine Bank* is controlling because the language of the Loan Agreements mirror each other.  According to SIP, "[t]hese substantively identical liability-limiting provisions should yield identical results.  Just as in *Alpine Bank*, the Limitation of Responsibility provision here protects SIP from any liability related to approving, making, or withholding any Advance."  [ECF No. 26 at 9].  Yet just because the language of the agreements is the same does not mean that the claims are the same.  In *Alpine Bank*, the Hubbells brought their action because they had relied on the Bank's payments as representations.  As discussed, the same is not true here.

SIP continues, "Distinguishing *Alpine Bank* on the basis that Ball Four told FirsTier about alleged construction defects is really just a sly attempt to end-run the loan agreement's rejection of a duty to supervise or inspect construction."  [ECF No. 26 at 11].  However, one could say that it is SIP who is being sly by mischaracterizing Ball Four's claims.  Its brief characterizes Ball Four's good faith claim as seeking to have SIP indemnify Ball Four against construction defects in spite of the Limitation of Responsibility provision.  But Ball Four has made it clear that it is seeking to hold SIP responsible for FirsTier's having made payments to

contractors *in bad faith*, not because it relied on FirsTier's payments as proof of the adequacy of the construction. In my view, SIP's effort to fit the present facts into the fact pattern in *Alpine Bank* doesn't work.

The Court has also read the briefs on Ball Four's Motion for Leave to Appeal Pursuant to Bankruptcy Rule 8003 [ECF No. 2] and denies the motion. In light of this Court's disposition of the summary judgment issue on the implied covenant claim, and the consequent remand for further proceedings in the Bankruptcy Court, it does not make sense for this Court to consider the core claim appeal on an interlocutory basis.

## ORDER

1. Plaintiff-Appellant Ball Four's Objection/Appeal of Magistrate Judge Decision to District Court [ECF No. 23] is GRANTED. Based upon its de novo review, the Court denies Defendant-Appellee SIP's motion for summary judgment on the Third Claim for Relief (implied covenant of good faith and fair dealing). That is the only issue addressed in this Order, although it likely requires the denial of the motion for summary judgment on the First Claim (breach of contract) as well, as the two claims appear to be substantively duplicative. The case is remanded to the Bankruptcy Court for trial and further proceedings as may be appropriate.

2. Appellant's Motion for Leave to Appeal Pursuant to Bankruptcy Rule 8003 [ECF No. 2] is DENIED.

DATED this 15th day of May, 2014.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge